

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00026-CV

_____

IN THE INTEREST OF M.J., A CHILD

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-674500-19

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

In this appeal from a judgment terminating a parent–child relationship between a father and child (Janie),[1] we must determine whether the judgment should be reversed because Father's appointed trial counsel was ineffective by failing to preserve legal- and factual-sufficiency challenges to the jury's finding that terminating the parent–child relationship was in Janie's best interest. Because we determine that the evidence was both legally and factually sufficient to support the jury's best-interest finding—and therefore that any deficient performance did not prejudice the case's outcome—we affirm.

## Procedural Background

Father appeals from a judgment terminating his parent–child relationship with Janie[2] based on jury findings (1) that he endangered her, knowingly allowed her to remain in endangering conditions or surroundings, failed to comply with a court-ordered service plan to obtain her return, and constructively abandoned her, and (2) that termination was in her best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E), (N)–(O), (b)(2). The trial court's judgment expressly

---

[1]We use an alias to refer to the child, and we do not include any factual details from which she might be identified. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Mother executed an irrevocable affidavit of relinquishment. She has not appealed.

provided that Father's appointed trial counsel would "continue in that capacity until all appeals [were] exhausted or waived."

Nine days after the trial court signed the termination judgment, Father's appointed trial counsel[3] filed a notice of appeal on his behalf but did not file a motion for new trial.[4] Three weeks after filing the notice of appeal, trial counsel filed a motion to withdraw—despite the trial court's prior finding that she should remain appointed until appeals were exhausted—alleging that good cause existed for her withdrawal because (1) she had been appointed trial counsel because Father did not have the means to hire his own attorney; (2) Father had requested the appointment of appellate counsel; and (3) she was filing the motion so that appellate counsel could file an appeal.[5]

Despite the fact that counsel's withdrawal motion did not expressly state good cause for withdrawal, *see id.* § 107.016; *In re P.M.*, 520 S.W.3d 24, 27–28 (Tex. 2016) (order), the trial court granted the motion—finding that "good cause exist[ed] for [counsel's] withdrawal"—and appointed substitute counsel. The withdrawal and

---

[3]Father was represented by two attorneys at trial, but the record does not contain an appointment order for one of them; that attorney did not file a withdrawal motion.

[4]Additionally, at trial, she had not moved for a directed verdict or objected on the record to the jury charge.

[5]We can only assume that trial counsel was trying to convey that she was not qualified to serve as appellate counsel.

3

appointment order is dated March 1, 2023, after the time for filing a motion for new trial had passed. *See* Tex. R. Civ. P. 329b(a).

Father's newly appointed appellate counsel filed a brief raising a single issue: that Father's trial counsel was ineffective for failing to file a motion for new trial because, by failing to do so, she failed to preserve any appellate complaint about the sufficiency of the evidence to prove the jury's best-interest finding.

**Appointed Counsel in Termination Cases**

In Texas, an indigent parent against whom the State has initiated a proceeding to terminate the parent–child relationship is entitled to effective appointed counsel. *See* Tex. Fam. Code Ann. § 107.013(a)(1); *In re D.T.*, 625 S.W.3d 62, 69 (Tex. 2021); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). We review ineffective-assistance claims in such proceedings by the familiar United States Supreme Court test applicable to criminal cases, *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.W.3d 2052, 2064 (1984). *M.S.*, 115 S.W.3d at 545. The parent must show not only that counsel's performance was deficient, but also that the deficient performance prejudiced the defense, i.e., that but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 545, 549–50.

Unlike criminal-case defendants, parents in termination cases have no separate procedural vehicle (such as a postconviction habeas proceeding) at which to make a record to support ineffective-assistance claims. *In re A.L.*, No. 04-17-00620-CV, 2018

4

WL 987484, at *8 (Tex. App.—San Antonio Feb. 21, 2018, no pet.) (mem. op.).

Thus, the record from the termination trial itself—whether supplemented by new-trial testimony or not—is the sole source of facts to support an ineffective-assistance-at-trial claim.[6]

Here, Father's counsel failed to preserve legal-sufficiency challenges to the jury's best-interest finding by failing to seek a directed verdict, object to the inclusion of questions in the charge, or both. *See In re A.H.*, No. 02-22-00019-CV, 2022 WL 1573408, at *3 (Tex. App.—Fort Worth May 19, 2022, pet. denied) (mem. op.). She failed to preserve a factual-sufficiency challenge to the jury finding by failing to file a motion for new trial. *See* Tex. R. Civ. P. 324(a)–(b); *A.H.*, 2022 WL 1573408, at *3. Thus, whether the evidence is legally and factually sufficient to support the jury's best-

---

[6]"To remedy this inequity, some appellate courts have held that the appropriate remedy is to abate the appeal and remand the case to the trial court for a hearing at which a parent may develop a record." *See In re D.H.G.*, No. 04-21-00183-CV, 2021 WL 5088738, at *3 (Tex. App.—San Antonio Nov. 3, 2021, pet. denied) (mem. op.); *In re M.E.–M.N.*, 342 S.W.3d 254, 258 (Tex. App.—Fort Worth 2011, pet. denied). But "[w]hether abatement is appropriate will depend on the facts of each termination case and the specific allegation of ineffective assistance." *D.H.G.*, 2021 WL 5088738, at *3 (quoting *In re K.K.*, 180 S.W.3d 685, 688 (Tex. App.—Waco 2005, no pet.) (per curiam) (order)).

Here, we need not abate because Father has not satisfied the second *Strickland* prong: that there is a reasonable probability that, but for trial counsel's asserted deficiencies, the outcome of the proceeding would have been different. *See id.* at *4; *A.L.*, 2018 WL 987484 at *9.

interest finding informs our determination of the second *Strickland* prong.[7]  *See D.H.G.*, 2021 WL 5088738, at *5–6.

## Standard of Review and Applicable Law

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).  In reviewing best-interest evidence, we consider nonexclusive factors that the factfinder may apply:

- the child's desires;

- the child's current and future emotional and physical needs;

- the current and future emotional and physical danger to the child;

- the parenting abilities of those seeking custody and programs available to assist them;

- the parties' plans for the child, including the stability of the proposed home or placement;

- the parent's acts or omissions suggesting that the existing parent–child relationship is inappropriate; and

- any excuse for the parent's acts or omissions.

---

[7]Father argues as part of the second *Strickland* prong that, but for counsel's errors—including failing to seek enough information at trial regarding the *Holley* factors—the result of the trial would have been different because there would have been insufficient facts on which to show that termination was in Janie's best interest. But we cannot speculate on what the record would have shown, only what it does show.

6

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Additionally, evidence probative of conduct grounds for termination—here, endangerment, abandonment, and failure to complete a court-ordered service plan—may also be probative of best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

To determine whether the evidence supporting a finding is legally sufficient, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

In determining the factual sufficiency of the evidence supporting a best-interest finding, we must perform "an exacting review of the entire record," *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014), to decide whether a factfinder could reasonably form a firm conviction or belief that terminating the parent–child relationship would be in the child's best interest, Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

For both types of review, we must remember that the factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## Evidence and Application

### Father's relationship with Mother

Mother met Father when she was nineteen. She said he "stalked" her as she was coming out of a store and gave her his phone number. They began a regular intimate relationship but were not dating. Although by that time Mother had already engaged in sex work on her own, Father became her pimp.[8] Father discontinued contact with her after she told him she was pregnant,[9] and he denied being the child's father. He blocked her number on his phone and provided no financial or other support. Father frightened Mother a little, and he was emotionally manipulative about her giving him the money she made, but she liked the attention he gave her. Nevertheless, she felt like he exploited and manipulated her. For example, during the case's pendency, she gave Father $7,000 that she had inherited from her father; he

---

[8]Mother testified that even though she was already engaging in sex work when she met Father and that when she was with him she set up her own encounters and rates, Father nevertheless took her money, encouraged her to keep her customers even if she did not want to have sex with them, and told her she was not making enough money.

[9]Mother never wavered from her testimony that although she was engaging in prostitution when Janie was conceived, she knew that no one else but Father could have conceived the child. The jury was entitled to resolve any inconsistency in her testimony. *See J.P.B.*, 180 S.W.3d at 573.

kept the money and did not tell her what he did with it. She assumed that he had spent it on his children and "his needs." Father claimed that he deposited the money in an account for Mother for safekeeping.

According to Father, he befriended Mother because she told him she was in a bad situation; he had sex with her only once. Father said that he tried to talk to Mother when he found out she was pregnant, but she denied his paternity and told him his "services were no longer needed" because she had a support system. However, Father also testified that the first time he found out Janie might be his child was when a Department of Family and Protective Services investigator tried to talk to him in 2021.

Janie was born in late 2019. Two months later, the Office of the Attorney General (OAG) sued Father to establish paternity and child support. Father claimed not to know about the suit even though the return of service shows that he was personally served in January 2020. According to Mother, there was never a hearing on the OAG case because of Janie's removal in June 2021.

**Father initially refuses placement**

Janie was an almost eighteen-month-old when she was removed from Mother's care and placed with Foster Father and Foster Mother; the Department had been investigating Mother for several months and removed Janie after both Mother and

Janie tested positive for cocaine and methamphetamine.[10]  Mother had been forced to leave two living arrangements—one with friends and the other with her father—because of altercations, and at the time of removal was living at Presbyterian Night Shelter.  Mother was unemployed and could not provide any suitable alternative placements for Janie;[11] the Department investigator at first was unable to find Father after searching "different websites and different social media."

The investigator eventually found an address for Father, but when he went to that address, a man answered and said Father was not there.  The investigator left his card, and Father contacted him by phone before the investigator could leave the premises.  When the investigator later met Father at a show-cause hearing, he realized that Father was the man who had answered the door that day.

During the investigator's call with Father, Father said he did not know if he was Janie's father and that he needed a DNA test.[12]  When the investigator asked

---

[10]Mother also tested positive for amphetamine and marijuana.  Janie's positive test was for "exposure."  The Department investigator testified that such a result is problematic because it indicates Janie was present when drugs were being used.  Because Janie was so young that she was unable to care for and protect herself, Mother's drug use would have impaired her ability to make decisions and provide care for Janie.

[11]At first, Mother would not tell the investigator Father's name and said she did not want him to be part of her life until he got a DNA test.

[12]The investigator testified that he was under the impression at the time that a DNA test had been requested by the OAG, but it had not yet been conducted.

Father if he would be willing to have her placed with him instead of being removed,[13] Father "repeated the same thing[,] . . . that he didn't know if he was [her] dad." Three times, Father declined the investigator's request to place Janie with him.[14] Father also did not offer any relative placements. The investigator did not make any findings as to Father as a result of the investigation.

Father testified that when he first told the investigator that he did not know whether Janie was his daughter, the investigator told Father that he could no longer talk to him about the investigation and that Father would need to speak to his lawyer. Father said that although "[b]efore court" he did not know whether Janie existed, he assumed she was living in "decent" conditions.

Once Father's paternity was confirmed, he openly expressed his desire to have Janie placed in his home.

**Father's drug use**

Father's paternity was not confirmed until October 2021. Although Father had begun visits with Janie before then, the Department had not created a service plan for

---

[13]The investigator testified that a DNA test would not have been required for Janie to have been placed with Father and that he would have considered Father as a placement at that time.

[14]Although the investigator set up an initial visit between Janie and Mother, which Mother failed to attend, he did not offer the same to Father because Father had "told [him] he didn't know if it was his child. He didn't want to be a parent."

11

him because "he was not present as part of the concerns that [had] brought [Janie] into care."

"In late September" 2021, the Department became concerned that Father was using drugs.[15]  Mother called the Department's caseworker[16] from rehab and expressed her concern about Janie's being placed with Father because, according to Mother, he had used methamphetamine with her "just a few days" before she went to rehab.  Mother also told the caseworker that Father "was a pimp, so he prostituted other women,[17] and he had approached her to work for him."  Mother seemed reluctant, hesitant, and scared to give this information[18] and asked the caseworker not to confront Father with it.  At one point, Mother recanted her assertion that Father was a pimp, but she later admitted that she had done so out of fear and confirmed to the caseworker that she had initially told the truth.[19]

---

[15]Father also had one misdemeanor conviction for marijuana possession.

[16]The caseworker until September 2022 was an Our Community-Our Kids (OCOK) contractor for the Department.

[17]At trial, Mother said that she did not know of any other women for whom Father had acted as a pimp.

[18]The caseworker found Mother to be vulnerable, scared, and easily manipulated.  She had a need for ongoing counseling after drug treatment.

[19]Mother also told the woman who observed visits with Janie that Father "would pressure her to get high with him[ and] to sleep with men for money so that she could get him drugs or they could get drugs and do them together while she was pregnant."  Mother was afraid of him because he would show up where she lived—uninvited—and she was afraid he would physically hurt her.

In October 2021, the Department drug tested Father. A urine test (UA) was positive for marijuana only, but a hair test was positive for both marijuana and methamphetamine. Father acknowledged using marijuana, but he denied using methamphetamine, explaining that he had consumed an unidentified edible on a trip to Las Vegas and thought it could have been tampered with. Later, though, he admitted to the caseworker that "he was hanging out with [Mother] during the early part of the case and was around her when she was using meth and . . . potentially . . . could've been exposed to that." Father again tested positive for marijuana in November 2021.

The caseworker drafted a limited service plan for Father in December 2021, after receiving the results of Father's drug testing. He reviewed the plan with Father "pretty immediately" but ended up emailing it to Father after he skipped visits. The caseworker "was worried about [Father's] involvement with illicit substances[,] methamphetamine and marijuana," as well as "his ability to provide proper and safe care for" Janie. Although the caseworker requested that Father drug test in January and April 2022, he did not.

Father did submit to a drug test in May 2022, and both the hair and UA tests were positive for marijuana. Although the caseworker had referred Father to a substance-abuse center in December 2021, Father did not call the center until May 26,

2022. The center recommended outpatient services[20] and scheduled a time but Father never went.

Father failed to take a requested drug test in June 2022.[21] And although he had a negative drug test in July 2022, the next month he tested positive for marijuana on a hair test but negative on a UA. Father also had a negative UA but positive hair test in September 2022.

Father admitted to the caseworker that he used marijuana but said he was trying to leave it behind. The caseworker was concerned about Father's drug use—even if he was using only marijuana—because of Janie's age, at which she required a higher level of supervision than would an older child.

**Father's August 2022 drug and firearm possession**

A City of Irving police officer testified that he stopped Father on August 18, 2022. The car smelled overwhelmingly of marijuana.[22] Father had a firearm in his pocket that had one round in the chamber. The officer also found a four-gram

---

[20]Father's drug assessment showed "mild marijuana substance abuse disorder." He never admitted to using methamphetamine.

[21]All of the missed tests were presumed positive in accordance with the court-approved service plan. The caseworker admitted that Father had said he had a hard time getting time off work to take a drug test, so the caseworker gave him extra time: 48–72 hours after a request instead of 24–48.

[22]Father and his passenger appeared to be a couple. The Department was under the impression that she was Father's sister or friend. At trial, Father called her a close family friend, but he admitted lying about her being his sister.

package of THC gummies on the floor of the car in open view.[23] As a result, Father was charged with felony drug possession and unlawful carrying of a weapon.[24] Officers took Father into custody[25] because he had outstanding warrants from three different cities—Class C misdemeanors for "no driver's license, drug paraphernalia, [and] failure to maintain financial responsibility." Nevertheless, during the stop, Father was "[a]greeable, mild-mannered, [and] compliant."

**Father's visits with Janie**

A Department subcontractor who observed Janie's visits with Mother and Father testified about her impressions. Janie's first visits were with Father alone for the first hour and then Mother for the second hour; later, the two visited for the full time together until they were ordered to stop "because they had altercation issues."[26] Janie "did not know [Father] at all the first visit. She had never met him."[27] For around the first two months, Janie cried and was afraid around Father; as visits

---

[23]The officer also found "the very end" of a marijuana blunt or cigarette but did not seize it because he was already charging Father with offenses. Although gummies can have an odor, the officer assumed the marijuana smell in the car was from the smoked item rather than the gummies.

[24]Father's service plan required him to refrain from engaging in criminal activity.

[25]Father never disclosed the arrest to the Department.

[26]At trial, Mother testified that she and Father would smoke methamphetamine before attending visits together.

[27]The caseworker also testified that Father had "no involvement" with Janie before she was placed in foster care.

progressed, her reaction to him was better but there were still "more bad visits than good visits when it [came] to crying and her trying to open up with him." According to the observer, Father tried to engage with Janie, but she "never initiated it" and "[h]e had to work for everything he got." In contrast, Janie was "never . . . afraid of" Mother. She was happy to see her mother, was very vocal, and let Mother touch her. Although Father tried, Janie did not interact with him the same way because she "just wasn't as comfortable with him."

Father came to the first visits with his fiancée; while he was engaged, he visited consistently. Janie engaged much more with the fiancée, who would give Janie snacks and comb her hair. After Father and the fiancée broke up around August or September 2021, the visits were "rougher" and inconsistent; once Father went an entire month without visiting. Janie "cried a lot more" and "was just totally afraid." "The last visit ended like the first visit started" in terms of crying and fear.[28] Nevertheless, Father would engage with Janie, reading to her, working on a sticker book, and playing on the floor. Janie would warm up during the latter part of visits with Father and, after months of consistent visitation, would sit on his lap.[29]

---

[28]In contrast, in the last visit the caseworker observed, although Janie was hesitant and standoffish at first, she warmed up more quickly than she had during some of the past visits, and she and Father were able to play together. In the one before that, though, Janie was "pretty hysterical" and wouldn't go into the visit room without Foster Father.

[29]At one of the September 2022 visits, the permanency specialist saw Janie "start[] shaking her head, 'No,'" when she saw Father walking through the door, and

16

The Department observer had concerns for Janie's wellbeing if she were to be placed with Father because Janie "was not reacting to him in a way that a child would react to a parent if they felt safe and secure." The Department's permanency specialist[30] admitted that the Department can set up transition visits that gradually get longer but had not done so here because Father had made no progress on his service plan and making behavioral changes.

Father missed five to six visits between December 16, 2021, and February 3, 2022, and twelve to thirteen scheduled visits between February 3, 2022, and May 27, 2022;[31] he also ended the February 3, 2022 Zoom visit early. Father smelled of marijuana at the May 27, 2022 visit.[32] But he was allowed to remain because "he wasn't acting as if he was not able to carry out the visit." Father did not visit again until August 31, 2022. Father attended most visits in September and October 2022—the months before trial—but at one of them, he smelled like marijuana. He missed

_____

it "was very difficult to get her into the visit room." At another, Father was more hands off, but this concerned the permanency specialist because, as an almost three-year-old, Janie needed him to try to engage her. The visit after that was better because Janie started with Mother first.

[30]The OCOK caseworker left employment in September 2022, at which point a Department permanency specialist took over.

[31]In April 2022, the caseworker had warned Father that he needed to "get going" if "he truly want[ed]" Janie "in his care."

[32]He brought one of his other children to that visit. The caseworker admitted Father was "starting to show more engagement [at that time] than he had in months past."

17

two of the scheduled visits and left early from one.

Father told the caseworker that "he had intentionally disappeared from the case with his reasoning being that he thought [Janie] was going back to [Mother,] and he thought that he was stepping out of the way to let that happen." This concerned the caseworker because disappearing if Janie were returned to Mother did not "show a desire to want to be a father to" Janie.

**Father's living arrangements**

When the caseworker first visited Father, he was living in an apartment with two of his children[33] and their mother (Roommate); Father was not in a romantic relationship with Roommate at the time. However, Father was engaged to another woman.[34] Father had moved in with Roommate because he had nowhere else to go, and she had offered for him to live with her in exchange for assisting with their two children, a five-year-old and three-year-old. Later, "[i]t was just a choice": "It's the fact of me wanting to be around my kids because . . . I have ten kids. And anyone that knows, my kids mean so much to me primarily. So, yes, that's why I was there, to have as much contact with my children as possible."

Although the caseworker visited Roommate's apartment in August 2021, Father indicated at that time that Janie would be coming to live in his fiancée's home,

---

[33]Janie is Father's eleventh child. Father has no Department history with any child but Janie.

[34]In counseling Father and his fiancée, the Department observer had recommended that Father move out of Roommate's home.

so the caseworker inspected that home in October 2021. The caseworker did not visit with Father in person from November 2021 to January 2022. It was not until "very much later" that Father told the caseworker that he and his fiancée had broken up.

The caseworker had difficulty communicating with Father and setting up monthly home visits. When trying to call Father, he often received a no-working-number message.

Eventually, the caseworker was able to inspect Roommate's apartment; although it was "dirty and unkempt," there were "no major safety concerns." Father's two children living there appeared to be well cared for. Father's drug use did not concern the caseworker as much regarding those children because their mother was there and she was their primary caretaker. However, the caseworker thought that "at times [Father] would be left with them to care for them maybe throughout portions of the day."

The caseworker concluded that although Father was living in safe housing, it was not stable because Father was "moving from place to place, woman to woman."

**Father's explanations at trial**

Father testified that he never had the chance to offer family members as alternative placements and asserted that some of his recommended placements would pass a background check. According to Father, his caseworker was not as open with him as with Mother. Father was under the impression that Janie was to have been placed with him once the DNA test confirmed his paternity.

19

Father testified that in early 2022, he ran over his phone, so he was without phone access for two to two-and-a-half months. He could not contact anyone and could only access email at work.

Father blamed his missing visits on his lack of a phone and inability to contact the Department. But he also claimed that he stopped visiting Janie and working services because the Department had refused to accommodate his employment change that necessitated a new visitation date and time. He missed the visits "in order to continue with [his] life." Father said that he had trouble communicating with and getting help from his caseworker, particularly with respect to visits; according to Father, the caseworker would not accommodate his schedule because it was not conducive to the foster parents' schedule.

Father denied not being allowed to visit Janie, or having a visit with her cut short, because the Department representatives thought he smelled like marijuana. He claimed that the Department would often deny him visits when he did not confirm the required twenty-four hours in advance, even if only a half hour late. He also claimed that the visit schedule affected his ability to work, blamed the Department for never offering weekend visits, and said that his initial visits with Janie were scheduled with the observer's and Mother's convenience in mind, not his.

Father said his first visits with Janie were "rough" but got better after he asked the foster parents not to remain in the room with her when he came in because she would keep looking to them for comfort. Once they started leaving the room before

Father arrived, Janie started playing with him "instantly." Father also claimed to have had trouble visiting because he did not own a car and the Department would help only Mother with transportation.

Father said that although he made the initial contact for the drug assessment, he did not attend any meetings because the recovery center never called him to set them up. But Father admitted that he had not stopped using marijuana sooner because he thought he could get away with it. He blamed his October 2021 positive methamphetamine test on being physically near Mother when she was smoking; he estimated this contact had been around June 2021.

Overall, Father blamed the Department for his confusion and failure to complete services;[35] he did not know that his court-appointed attorney could have helped him navigate the process. Father claimed he never saw his service plan and that he knew to attend the FOCUS for fathers class[36] and schedule the drug assessment only because the caseworker had texted him to do so. He said the only thing the Department had told him to do was to make sure Janie had a private room in the home where he was living.

Father felt that Mother had been provided more opportunities to help get Janie back, and he had "begged for" more. He also felt that he had been treated unfairly

---

[35]The permanency specialist agreed that there had been instability with the caseworkers, but she did not see any reason Father should have been confused about what was expected of him.

[36]By the time of trial, Father had completed this course.

throughout the process and had to always accommodate the foster parents. Nevertheless, Father thought he had "done a great job" trying to work his services.

Father testified that he began carrying a gun—which he said was "legal"[37]—after December 2020, when he was robbed and shot at a game room where he was working.

**Father's situation at the time of trial**

Roommate's apartment had three bedrooms and was located in a gated community. Janie would have her own bedroom. Father testified that there were several daycares, an elementary school, and a bus stop around his residence. He had support from his aunts and his mother, who he said would also be good placements for Janie. He offered his sister and brother as placements. Father said he and his family were willing to shift their lives for Janie. According to Father, Roommate could also help with Janie.

Father had a "continuing relationship" with all of his other children. He said he had "raised" them "from [birth] until they went to school." Father detailed the time he spent with the two children with whom he lived. Father also testified about some of the concepts he had learned at the fathers class, which was about how to be a better man, not just a better father. Father said he and Janie had grown together and

_____

[37]Yet Father admitted that on March 6, 2020, while driving with four children in the car (none of them Janie), Fort Worth police pulled him over. When he exited the car, he told the officer he had a weapon under his seat. But Father denied that the officer found drugs.

22

that she would be "primarily [his] child." He acknowledged that he would have to change "a lot of [his] life decisions" for her to be placed with him.

Father worked seasonally as a basketball coach[38] and tax preparer. At the time of trial, Father worked 60–70 hours a week as a Subway manager. He said he would be working from 6 a.m. to 2:30 p.m. at Subway and 2:30 p.m. to 1:30 a.m. at the tax preparation office. But he would change work drastically if Janie were placed in his care, not going to the tax preparing job but doing tax preparation at home instead. Father testified that his annual income was between $60,000 to $70,000 per year.

Father acknowledged that he had five or six active child-support cases with the OAG. At the time of trial, he paid $394[39] a week in child support. Nevertheless, he was around $10,000 in arrears on all of the cases combined. He also gave one of the mothers $250 every month for that child's private-school tuition.

**After initial improvement, Mother started using drugs again**

Mother found out during the case that she was pregnant with another child. That child was also placed with Janie's foster parents. While Janie's case was pending, Mother went to rehab and showed some improvement, but then she continued to use drugs, could not provide a safe environment for Janie, was unemployed, failed to

---

[38]Although Father never documented employment for the Department, his testimony about the jobs he worked comports with the caseworker's. Father told the caseworker that he often worked two jobs during the case.

[39]Father testified that he paid five different weekly amounts on five different cases—$79, $58, $64, $72, and $54. Although these amounts total $327, not $394, the fact remains that Father is obligated to pay a significant weekly child-support amount.

complete her service plan, and lived in a shelter because she could not maintain stable housing. She shifted her focus from trying to have Janie returned to her and instead worked on trying to have her son returned to her.

**Foster Father and Foster Mother[40] interaction with Janie**

Janie had a six-month speech delay when she was first placed with the foster parents, but she improved after working with a specialist, and by the time of trial, she was "several months" ahead. In the beginning, she had trouble regulating her behavior "for someone of her age." She was also slightly overweight.

Foster Father testified that, at first, he and Foster Mother tried to encourage Mother when she was doing well; they wanted her to get better and get Janie back. They understood that even though Janie's brother had been placed with them, Mother was trying to get him back, and they wanted that to happen.

Foster Father testified that, to him, Janie was his daughter. She called him Daddy and Foster Mother Mommy. Mother testified that Janie loved her foster family and knew the parents as Mommy and Daddy. They sent Mother pictures "all the time" and Janie was happy.

The foster parents' plans for Janie were for her to stay in daycare and then go to public school, continue in extracurricular activities, go to college, and "have a normal life." Both foster parents were employed with "very flexible work schedules." Foster Father did not think Mother and Father could provide such an environment;

---

[40]The foster parents intervened in the case.

he also thought that uprooting Janie from "her home" and "normalcy" would be traumatic. The caseworker testified that the foster parents were "very active with" Janie, involving her in extracurricular activities such as swimming; they also took her on vacations.

Mother understood that she would have some kind of visitation with Janie if the foster parents were to adopt her; she did not know what arrangement, if any, they had with Father. Foster Father and Foster Mother thought it was in Janie's best interest for Mother to have a "lifelong and continued" relationship with Janie. They had tried to talk to Father about open adoption. Foster Father did not believe it was in Janie's best interest "not to know" Father.

Mother's interactions with the foster parents were "[a]micable, pleasant, [and] friendly." They were supportive of Mother and planned to facilitate an appropriate relationship with Janie and Mother, which the caseworker thought was in Janie's best interest because of her bond with Mother. He thought Mother was "making a sacrificial decision . . . in favor of [Janie's] best interest over [Mother's] own personal interest." Father's interactions with them were "friendly in a professional way."

Foster Father testified that Janie is a different ethnicity from the foster parents and that he and Foster Mother had taken classes on cultural competency and how to help Janie learn about her heritage and unique needs. For example, the visit observer testified that they had asked her and others for advice on how to properly style Janie's hair.

**Witnesses' best-interest opinions**

Although the Department would have looked to Father for placement at the beginning of the case, by August 2022, it recommended termination of rights. The caseworker, permanency specialist, and visit observer all thought that Father's missing visits contributed to his lack of relationship with Janie. They also did not see continued improvement; Father continued to test positive on drug tests, and his August 2022 arrest raised concerns about his carrying a firearm. The caseworker and permanency specialist thought it would be traumatic for Janie to be taken away from the foster parents because of their bond. The Department was also concerned with Father's lack of stable relationships: "[W]hat would happen if he leaves one of his girlfriends and has to move somewhere else? Who's going to be the main caregiver for [Janie] if he were to have her in his possession?"

Mother thought taking Janie away from the foster parents would confuse and traumatize her. Mother did not believe that Father could provide Janie with a safe and stable future, and she was afraid that Janie would become too easily attached to women who were not a long-term part of Father's life. Mother thought that adoption by the foster parents was in Janie's best interest even though that meant terminating her rights and even if Mother were never allowed to visit Janie.

Father thought the foster parents had done a wonderful job and was grateful for their involvement with Janie. He testified that he would allow them visitation if Janie were placed with him.

26

**Analysis**

Based on the foregoing, whether viewed in the light most favorable to the jury's best-interest finding or neutrally, we hold that the jury could have found by clear and convincing evidence that termination of the parent–child relationship between Father and Janie was in Janie's best interest.    Under both applicable standards—*see J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28—the following evidence, in context, supports the jury's finding:

- (Second *Holley* factor)[41]  Janie needed a stable home and engaged parents who did not use drugs.  Her speech-therapy needs had been met.  And the evidence showed that Father and the foster parents could both provide a physically secure living environment.  But Father failed to consistently visit Janie to establish a relationship with her, and she had not had any contact with Father's proposed placements.  Also, removal from the foster parents' care risked causing Janie emotional trauma and upsetting her stability.

- (Third *Holley* factor)  Father's lack of desire to stop using marijuana could continue to endanger Janie.  As the caseworker testified, Janie was still at an age where she required intensive supervision, and marijuana use can impair a parent's judgment.  And Father's carrying a loaded gun around his other children and while this case was pending—and while continuing to use drugs—created both emotional and physical risks for Janie.

- (Fourth *Holley* factor)  Although there was not much evidence about the foster parents' or Father's parenting abilities and programs available to assist them, there was testimony that the foster parents had addressed Janie's speech-therapy needs and had taken advantage of cultural competency classes and other opportunities to learn about and expose Janie to her ethnic heritage.  They made sure she had access to extended family and other children.  Their bond with her was a loving and close one.  Father had a good relationship with his other children and contributed to their care, whether through court-ordered support, paying for their schooling, or providing supervision.  Nevertheless, he was in arrears on child support, and evidence supported a conclusion that he

---

[41]Janie was not old enough to express her desires (first *Holley* factor).

was willing to let others take primary responsibility for child-rearing, including with respect to Janie.

- (Fifth *Holley* factor)  The foster parents had been married for six years.  They wanted to give Janie a stable and secure home and, after daycare, to send her to public school and eventually to college.  They hoped to have access to college funds through the Department.  They also wanted to continue engaging Janie in extracurricular activities.  Father wanted Janie to attend school near the apartment where he lived and to get to know his family and other children, yet he had introduced Janie to only one of them.

- (Sixth *Holley* factor)  Mother admitted that continuing as Janie's parent was not in Janie's best interest.  After his initial denials, Father consistently wanted to have Janie placed with him.  But he never stopped using drugs, never attempted drug treatment, never provided the Department with suitable placement alternatives, continued to live with Roommate, failed to consistently visit Janie, continued to carry a weapon on his person while driving, and blamed his failures on the Department.  Although Father claimed to be an active parent, his conduct showed a willingness to let others take primary responsibility for his children.  The jury was entitled to believe not only that Father had sex with Mother knowing she was a prostitute and that she could conceive a child, but also that Father had no regard for continuing to conceive children with women with whom he did not intend to maintain a long-term relationship.  Moreover, Father neglected to consistently visit Janie.

- (Seventh *Holley* factor)  The jury did not have to believe any of Father's excuses for his failure to work services and to visit Janie consistently, particularly in light of his admissions that he lied to the caseworker and permanency specialist during the case.  Likewise, the jury did not have to believe that Father did not know he was possibly Janie's father, particularly in light of the existence and service of the OAG's paternity suit.  Finally, the jury could have concluded that Father did not want to actively parent Janie, considering his continued drug use after she came into the Department's care, all while caring for two other children and being in arrears on child support.

### Conclusion

We conclude that even if counsel's failure to preserve Father's sufficiency complaints constituted deficient performance, prejudice cannot be shown because the

28

evidence is both legally and factually sufficient to support the jury's best-interest finding. Thus, we overrule Father's sole, ineffective-assistance complaint, and we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: May 25, 2023